**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VALLE DEL SOL INCORPORATED;
COALICION DE DERECHOS
HUMANOS; UNITED FOOD AND
COMMERCIAL WORKERS
INTERNATIONAL UNION; BORDER
ACTION NETWORK; JIM SHEE;
UNKNOWN PARTY, Named as Jane
Doe #3 in Amended Complaint;
JOHN DOE #1, proceeding under
pseudonym; LUZ SANTIAGO;
ARIZONA SOUTH ASIANS FOR SAFE
FAMILIES; JAPANESE AMERICAN
CITIZENS LEAGUE; LOCAL 5 SERVICE
EMPLOYEES INTERNATIONAL UNION;
SOUTHSIDE PRESBYTERIAN CHURCH;
TONATIERRA COMMUNITY
DEVELOPMENT INSTITUTE; C.M., a
minor; ASIAN CHAMBER OF
COMMERCE OF ARIZONA; SERVICE
EMPLOYEES INTERNATIONAL UNION;
ARIZONA HISPANIC CHAMBER OF
COMMERCE; PEDRO ESPINOZA;
MAURA CASTILLO; JOSE ANGEL
VARGAS,

          *Plaintiffs-Appellees*,

          v.

No. 12-17152

D.C. No.
2:10-cv-01061-
SRB

OPINION

MICHAEL B. WHITING; EDWARD G.
RHEINHEIMER; DAISY FLORES, Gila
County Attorney, in her official
capacity; RICHARD M. ROMLEY,
Maricopa County Attorney, in his
official capacity; MATTHEW J.
SMITH, Mohave County Attorney, in
his official capacity; BRADLEY
CARLYON, Navajo County Attorney,
in his official capacity; SAM
VEDERMAN, La Paz County
Attorney, in his official capacity;
KENNY ANGLE, Graham County
Attorney, in his official capacity;
DEREK D. RAPIER, Greenlee County
Attorney, in his official capacity;
DAVID W. ROZEMA, Esq., Coconino
County Attorney, in his official
capacity; BARBARA LAWALL, Pima
County Attorney, in her official
capacity; JAMES P. WALSH, Pinal
County Attorney, in his official
capacity; GEORGE SILVA, Santa Cruz
County Attorney, in his official
capacity; SHEILA S. POLK, Yavapai
County Attorney, in her official
capacity; JON R. SMITH, Yuma
County Attorney in his official
capacity; JOSEPH DEDMAN, JR.,
Apache County Sheriff, in his
official capacity; BILL PRIBIL,
Coconino County Sheriff, in his
official capacity; ROD ROTHROCK,

Chief Deputy; JOHN R. ARMER, Gila County Sheriff, in his official Capacity; PRESTON J. ALLRED, Graham County Sheriff, in his official capacity; STEVEN N. TUCKER, Greenlee County Sheriff, in his official capacity; DONALD LOWERY, La Paz County Sheriff, in his official capacity; JOSEPH M. ARPAIO, Maricopa County Sheriff, in his official capacity; TOM SHEAHAN, Mohave County Sheriff, in his official capacity; KELLY CLARK, Navajo County Sheriff, in his official capacity; CLARENCE W. DUPNIK, Pima County Sheriff, in his official capacity; PAUL R. BABEU, Pinal County Sheriff, in his official capacity; TONY ESTRADA, Santa Cruz County Sheriff, in his official capacity; STEVE WAUGH, Yavapai County Sheriff, in his official capacity; RALPH OGDEN, Yuma County Sheriff, in his official capacity,

*Defendants*,

and

STATE OF ARIZONA; JANICE K. BREWER,
 *Intervenor-Defendants – Appellants*.

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
April 2, 2013—San Francisco, California

Filed October 8, 2013

Before: John T. Noonan, Richard A. Paez,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Bea

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's grant of a preliminary injunction in an action challenging Arizona Revised Statutes § 13-2929, which attempts to criminalize the harboring and transporting of unauthorized aliens within the state of Arizona.

The panel first held that an individual plaintiff, pastor Luz Santiago, and the organizational plaintiffs had standing to challenge Ariz. Rev. Stat. § 13-2929. The panel determined that Santiago had established a credible threat of prosecution

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and that the organizational plaintiffs had shown that their missions had been frustrated and their resources diverted as a result of § 13-2929.

The panel held that the statute as written was void for vagueness under the Due Process Clause because one of its key elements—being "in violation of a criminal offense"—was unintelligible. The panel further held that the provision which attempted to criminalize the harboring and transporting of unauthorized aliens, however it was interpreted, was preempted by federal law and thus invalid under the Supremacy Clause. The panel concluded that the district court did not abuse its discretion in holding that plaintiffs established the elements necessary to grant a preliminary injunction.

Concurring in part and dissenting in part, Judge Bea stated that he concurred with the majority regarding standing and the void for vagueness doctrine, as well as its holding that the district court did not abuse its discretion in holding that plaintiffs established the elements necessary to grant a preliminary injunction. Judge Bea dissented from Part III of the majority opinion, stating that because this case was resolved on other grounds, namely vagueness, the court should not have reached the preemption issue.

## COUNSEL

Kelly A. Kszywienski (argued), John J. Bouma and Robert A. Henry, Snell & Wilmer L.L.P, Phoenix, Arizona; Joseph Sciarrotta, Jr., Office of Governor Janice K. Brewer, Phoenix, Arizona; Thomas C. Horne, Michael Tryon and Evan Hiller, Office of the Attorney General for the State of Arizona, Phoenix, Arizona, for Intervenor-Defendants–Appellants.

Omar C. Jadwat (argued) and Dror Ladin, American Civil Liberties Union, New York, New York; Thomas A. Saenz, Victor Viramontes and Nicholás Espiritu, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Linton Joaquin, Karen C. Tumlin, Nora A. Preciado, Melissa S. Keaney and Alvaro M. Huerta, National Immigration Law Center, Los Angeles, California; Nina Perales, Mexican American Legal Defense and Educational Fund, San Antonio, Texas; Cecillia D. Wang, American Civil Liberties Union, San Francisco, California; Chris Newman and Jessica Karp, National Day Labor Organizing Network, Los Angeles, California; Justin Cox, American Civil Liberties Union, Atlanta, Georgia; Laboni Hoq, Maya Roy and Carmina Ocampo, Asian Pacific American Legal Center, Los Angeles, California; Daniel J. Pochoda, James Duff Lyall and Kelly Joyce Flood, ACLU Foundation of Arizona, Phoenix, Arizona; Marita Etcubañez and Jessica Chia, Asian American Justice Center, Washington, D.C.; Stephen P. Berzon and Jonathan Weissglass, Altshuler Berzon LLP, San Francisco, California; Aaron Leiderman, Munger, Tolles & Olson LLP, San Francisco, California; Daniel R. Ortega, Ortega Law Firm, P.C., Phoenix, Arizona; Bradley S. Phillips, Joseph J. Ybarra, Benjamin J. Maro, Lika C. Miyake and Margaret G. Ziegler, Munger, Tolles & Olson LLP, Los Angeles, California, for Plaintiffs-Appellees.

Mark B. Stern (argued), Stuart F. Delery, John S. Leonardo, Beth S. Brinkmann, Michael P. Abate, Benjamin M. Schultz, Daniel Tenny and Jeffrey E. Sandberg, United States Department of Justice, Washington, D.C., for Amicus Curiae United States of America.

Lawrence J. Joseph, Washington, D.C, for Amicus Curiae Eagle Forum Education & Legal Defense Fund.

Michael M. Hethmon and Garrett Roe, Immigration Reform Law Institute, Washington, D.C.; Kris W. Kobach, Kobach Law, LLC, Kansas City, Kansas, for Amicus Curiae Immigration Reform Law Institute.

Stephen Nickelsburg, Carla Gorniak and Erin Louise Palmer, Clifford Chance US LLP, Washington, D.C.; Henry L. Solano, Wilson Elser Moskowitz Edelman & Dicker, Denver, Colorado, for Amicus Curiae United Mexican States.

## OPINION

PAEZ, Circuit Judge:

Plaintiffs challenge Arizona Revised Statutes § 13-2929, which attempts to criminalize the harboring and transporting of unauthorized aliens within the state of Arizona.[1] The

---

[1] We use the term "unauthorized aliens" to refer to aliens who have entered or are present in the United States in violation of federal immigration law. This is the same convention that Arizona uses through out its briefs on appeal. The plaintiffs use the term "unauthorized immigrant," but, as the Third Circuit noted in *Lozano v. City of Hazelton*,

district court granted the plaintiffs' motion for a preliminary injunction with respect to this provision on the basis that § 13-2929 is preempted by federal law. Arizona appealed. We conclude that the statute as written is void for vagueness under the Due Process Clause because one of its key elements—being "in violation of a criminal offense"—is unintelligible. We also find that the provision, however it is interpreted, is preempted by federal law and thus invalid under the Supremacy Clause. Therefore, we affirm the district court's grant of a preliminary injunction.

## BACKGROUND

This case arises from the extensive litigation regarding Arizona's 2010 Senate Bill 1070 ("S.B. 1070"). S.B. 1070, which is comprised of a variety of immigration-related provisions, was passed in response to the growing presence of unauthorized aliens in Arizona. The stated purpose of S.B. 1070 is "to make attrition through enforcement the public policy of all state and government agencies in Arizona." S.B. 1070 § 1. It does so by creating "a variety of immigration-related state offenses and defin[ing] the immigration-enforcement authority of Arizona's state and local law enforcement officers." *United States v. Arizona*, 641 F.3d 339, 344 (9th Cir. 2011), *aff'd in part, rev'd in part*, 132 S. Ct. 2492 (2012).

The subject of this appeal is Ariz. Rev. Stat. § 13-2929, which was contained in section 5 of S.B. 1070. Section 13-

---

No. 07-3531, 2013 WL 3855549 at *1 n.1 (3d. Cir. July 26, 2013), in the context of a statute such as § 13-2929 the term "alien" is more precise.

2929 attempts to criminalize[2] transporting, concealing, harboring, or attempting to transport, conceal, or harbor an unauthorized alien, at least under certain circumstances. It also seeks to criminalize inducing or encouraging an unauthorized alien to come to or reside in Arizona. The full relevant text of the provision is reproduced here:

> A. It is unlawful for a person who is in violation of a criminal offense to:
>
> 1. Transport or move or attempt to transport or move an alien in this state, in furtherance of the illegal presence of the alien in the United States, in a means of transportation if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law.
>
> 2. Conceal, harbor or shield or attempt to conceal, harbor or shield an alien from detection in any place in this state, including any building or any means of transportation, if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law.
>
> 3. Encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such

---

[2] As will be discussed in more detail, *infra*, the statute as written fails to clearly criminalize any conduct.

coming to, entering or residing in this state is
or will be in violation of law.

Ariz. Rev. Stat. § 13-2929(A). A violation of § 13-2929 is a
class one misdemeanor carrying a fine of at least one
thousand dollars. § 13-2929(F). A violation involving "ten
or more illegal aliens" is a class 6 felony carrying a minimum
fine of one thousand dollars for each alien involved. *Id.* The
only exemptions to the statute are for child protective service
workers, first responders, ambulance attendants, and
emergency medical technicians acting in their official
capacities. § 13-2929(E).

In order to place this appeal in context, we review some
of the procedural history of the relevant litigation surrounding
S.B. 1070. Before S.B. 1070 went into effect, both the
private plaintiffs in the instant case and the United States,
separately, filed suit challenging various provisions of the
bill. As a result of that litigation, the district court
preliminarily enjoined four provisions of S.B. 1070—sections
2(B), 3, 5(C), and 6—on preemption grounds. *United States
v. Arizona*, 703 F. Supp. 2d 980, 987 (D. Ariz. 2010). The
United States also challenged the provision that is the subject
of this appeal, Ariz. Rev. Stat. § 13-2929, not on the basis of
preemption, but on the grounds that it was an improper
regulation of immigration and violated the Dormant
Commerce Clause. The district court rejected this challenge
to § 13-2929. *Id.* at 1003–04. Therefore, § 13-2929 went
into effect on July 29, 2010.

Arizona appealed the district court's preliminary
injunction. We affirmed, concluding that the provisions were
preempted by federal immigration law. *Arizona*, 641 F.3d at
366. The Supreme Court affirmed our decision with respect

to sections 3, 5(C), and 6, concluding that those three provisions were preempted by federal law. *United States v. Arizona*, 132 S. Ct. 2492, 2510 (2012). With respect to section 2(B), the Supreme Court reversed, concluding that the provision may be interpreted by the Arizona courts in a manner that survives constitutional scrutiny. *Id.* It left open the possibility of further preemption and constitutional challenges to section 2(B) as interpreted and applied. *Id.*

After the Supreme Court's decision in *Arizona*, the plaintiffs in this case renewed their motion for a preliminary injunction against section 2(B) of S.B. 1070[3] and Ariz. Rev. Stat. § 13-2929. The district court denied the plaintiffs' motion with respect to section 2(B), relying on the reasoning provided by the Supreme Court in *Arizona*, which it interpreted as providing "clear direction . . . that [s]ubsection 2(B) cannot be challenged further on its face before the law takes effect." The plaintiffs voluntarily dismissed their appeal of that ruling.

The plaintiffs' challenge to § 13-2929 differs from the United States' prior challenge because it is based on field and conflict preemption. The district court granted the preliminary injunction against § 13-2929, finding it both field and conflict preempted by federal immigration law. Arizona now appeals that ruling arguing that the plaintiffs do not have standing to challenge § 13-2929, and, if they do, they cannot

---

[3] The plaintiffs in this case sought a preliminary injunction enjoining enforcement of section 2(B) on the basis of Equal Protection and Fourth Amendment challenges to the provision, not brought by the United States in its case, which focused solely on preemption. The plaintiffs also argued that the record in this case, substantially more developed than the record in *Arizona*, sufficiently established preemption notwithstanding the Supreme Court's decision in *Arizona*.

demonstrate a likelihood of success on the merits or the other non-merits elements required for injunctive relief.

## STANDARD OF REVIEW

We review de novo questions of Article III justiciability, including standing. *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003).

We review the district court's grant of a preliminary injunction for abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). A court abuses it discretion when it applies an incorrect legal rule or relies upon "a factual finding that [is] illogical, implausible, or without support in inference that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009).

## ANALYSIS

## I.  STANDING

On appeal, Arizona argues that neither the individual plaintiff, Luz Santiago, nor the organizational plaintiffs have standing to challenge § 13-2929.  Since the question of constitutional standing "is not subject to waiver," we must first "ensure that [a] plaintiff has Article III standing." *Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1065 (9th Cir. 2010) (internal quotation marks omitted).

In order to demonstrate standing to seek injunctive relief under Article III,

> a plaintiff must show that he is under threat of
> suffering "injury in fact" that is concrete and
> particularized; the threat must be actual and
> imminent, not conjectural or hypothetical; it
> must be fairly traceable to the challenged
> action of the defendant; and it must be likely
> that a favorable judicial decision will prevent
> or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). We
need only conclude that one of the plaintiffs has standing in
order to consider the merits of the plaintiffs' claim. *See
Comite de Jornaleros de Redondo Beach v. City of Redondo
Beach*, 657 F.3d 936, 943–44 (9th Cir. 2011). Nonetheless,
we conclude that both Luz Santiago, the individual plaintiff,
and the organizational plaintiffs have standing to challenge
§ 13-2929.

### A. Individual Standing of Luz Santiago

Luz Santiago is a pastor of a church in Mesa, Arizona,
whose congregation is eighty percent unauthorized aliens.[4]
She "provides transportation and shelter to members of her
congregation," including those who are unauthorized aliens,
on a daily basis. In particular, she alleges that she often
drives congregants to school, court, and doctor's
appointments. Importantly, she "provides shelter to persons
who seek sanctuary in her church." In light of these
activities, Santiago alleges that she fears prosecution under
§ 13-2929. In denying Arizona's motion to dismiss, the

---

[4] The facts about Santiago's congregation and her activities within the
church are drawn from the allegations in the complaint. Arizona does not
contest the validity of any of Santiago's factual allegations.

district court concluded that "Santiago's allegations are sufficient to demonstrate a reasonable likelihood that [Ariz. Rev. Stat.] § 13-2929 could be enforced against her." We agree and therefore hold that Santiago has standing to challenge § 13-2929.

It is well-established that, although a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of a statute's operation or enforcement," a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers*, 444 U.S. 289, 298 (1979) (internal quotation marks omitted). Thus, Santiago need not await prosecution to challenge § 13-2929. *Id.* ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or a prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.") (internal quotation marks omitted). "[I]t is 'sufficient for standing purposes that the plaintiff intends to engage in a 'course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the provision will be invoked against the plaintiff.'" *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir. 2002) (quoting *Babbitt*, 442 U.S. at 298)).

Santiago has established a credible threat of prosecution under this statute, which she challenges on constitutional grounds.[5] She alleges that she provides, and plans to continue

---

[5] Arizona argues that Santiago does not have standing because she has not been prosecuted, or directly threatened with prosecution, by authorities in the past two years. But as discussed above, plaintiffs do not have to await prosecution to challenge unconstitutional statutes. In *Thomas v.*

to provide, shelter and transportation to her congregants, most of whom are unauthorized aliens, on a daily basis. Her actions, therefore, "fall within the plain language of [§ 13-2929's] prohibitions on transporting [and] harboring . . . undocumented immigrants." *Ga. Latino Alliance for Human Rights v. Gov. of Georgia*, 691 F.3d 1250, 1258 (11th Cir. 2012) (holding that an immigration attorney providing services to unauthorized aliens had individual standing to bring a pre-enforcement challenge to a practically identical provision in Georgia) [hereinafter *GLAHR*]. Because the injury alleged—a credible threat of prosecution under § 13-2929—is clearly traceable to § 13-2929, and can be redressed through an injunction enjoining enforcement of that provision, Santiago has standing to challenge it. *Id.* at 1260 ("Each injury is directly traceable to the passage of H.B. 87 [the cognate Georgia law] and would be redressed by enjoining each provision.").

---

*Anchorage Equal Rights Commission*, we held that we consider, as *one* of the factors in "evaluating the genuineness of a claimed threat of prosecution," "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings." 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). But we have never held that a specific threat is necessary to demonstrate standing. *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("The district court's decision implied that absent a threat or at least a warning that California might prosecute CPLC for its publications, CPLC could not possibly have suffered an injury-in-fact sufficient to give it standing. . . . Our ruling in *Thomas* did not purport to overrule years of Ninth Circuit and Supreme Court precedent recognizing the validity of pre-enforcement challenges to statutes infringing upon constitutional rights."); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Babbit*, 442 U.S. at 302 (finding standing where the plaintiff's "fear of criminal prosecution . . . is not imaginary or wholly speculative" even though the penalty "has not yet been applied and may never be applied").

Arizona argues that Santiago has not established a credible threat of prosecution for two reasons. First, Arizona argues that § 13-2929 only punishes the transportation or harboring of unauthorized aliens where the individual is committing some other predicate criminal offense, and Santiago has not alleged an intent to commit any other criminal offense. For the reasons discussed below, *infra* at section II, we do not believe that the text of the statute that supposedly imposes this requirement—"in violation of a criminal offense"—has any substantive content that would make prosecution of Santiago any less likely. For the purposes of our standing analysis, however, we use the interpretation asserted by Arizona because it appears to be the interpretation that Arizona law enforcement, which is charged with enforcing the law, has adopted.[6] If Santiago has alleged a likelihood of violating § 13-2929 as interpreted by Arizona law enforcement, then she has alleged a credible threat of prosecution.

Thus, even assuming the statute includes a predicate criminal offense requirement, Santiago has still alleged a credible threat of prosecution. First, in violating § 13-2929, Santiago will likely also be violating the federal harboring statute, 8 U.S.C. § 1324, which also criminalizes the harboring and transporting of unauthorized aliens with

---

[6] *See* Arizona Peace Officer Standards & Training Board, Support Law Enforcement and Safe Neighborhood Act Training Course 29 ("[B]efore I go to the first section let me just tell you that all three sections of the statute have a preliminary requirement. The person who is the suspect in the case, who you are focused on, has to be in violation of a criminal law at the time that they commit one of these three additional offenses [listed in Ariz. Rev. Stat. § 13-2929].").

practically identical provisions.[7]  Notably, Arizona does not contend that a violation of the federal harboring statute would not satisfy the predicate criminal offense element.  Second, the breadth of the supposed predicate criminal offense provision, which includes a violation of *any* federal or state statute, defeats any claim that the provision narrows the scope of the law sufficiently to deprive Santiago of standing.  In *GLAHR*, the Eleventh Circuit addressed an identical provision in a similar statute and found the predicate criminal provision too broad to have any constitutionally significant effect on the likelihood of prosecution:  "We do not agree with the State officers that the probability of an officer's finding of probable cause for any violation of state or federal law is comparable to the likelihood of the 'sequence of individually improbable events' held to be speculative in *Lyons*."  691 F.3d at 1259 (quoting *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1162 (11th Cir. 2008)).  We agree with the Eleventh Circuit.

Second, Arizona argues that Santiago has not alleged an intent to violate § 13-2929 (or 8 U.S.C. § 1324 for purposes of the predicate criminal offense element) because she has not alleged an "inten[t] to assist [any] alien in violating the federal immigration laws."  Arizona contends that the text in § 13-2929 (which mirrors 8 U.S.C. § 1324) that criminalizes transporting an unauthorized alien "in furtherance of the illegal presence of the alien in the United States" and the harboring of an unauthorized alien "from detection" clearly imposes a requirement that the individual actually intend to help the alien violate the federal immigration laws.  We disagree.

---

[7] Section 1324 only differs from § 13-2929 in two ways, discussed *infra*, neither of which would apply Santiago's alleged activities.

Section 13-2929 does not clearly include an intent requirement with respect to the "furtherance of illegal presence" or shielding "from detection" elements of the crime.  The statute could be read to prohibit providing shelter that shields an alien from detection by immigration officials or transporting an alien in a manner that furthers his illegal presence regardless of the individual's intent.  This is a reasonable reading of the statute since the statute includes a knowledge requirement with respect to the alien's immigration status.  *See* Ariz. Rev. Stat. § 13-2929(A) (criminalizing these acts only if the person "knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of the law").  The Arizona legislature clearly knew how to include a scienter requirement but chose not to phrase the statute to impose a "purposefully" mens rea requirement with respect to the "in furtherance of the illegal presence" or "from detection" elements.[8]  Thus, an individual who knowingly or recklessly provides transportation and shelter to unauthorized aliens, as Santiago does, can allege a credible threat of prosecution under § 13-2929 without alleging a specific intent to assist an unauthorized alien in violating the federal immigration laws.[9]

---

[8] Although Arizona opines that the statute will be interpreted to impose such a requirement, there is no evidence that this is anything more than a litigation position.  Arizona has not produced any evidence that Arizona law enforcement or Arizona courts have interpreted or will interpret the provision in this manner.

[9] Arizona attempts to bolster its intent argument by referencing cases where federal courts *have* interpreted the text of 8 U.S.C. § 1324 to require an intent to assist aliens in violating the federal immigration laws. *See United States v. You*, 382 F.3d 958, 966 (9th Cir. 2004) (approving a jury instruction that requires the jury to find that the defendant acted with

In any event, even if the statute does include an intent requirement, Santiago's statement that she "provides shelter to persons who seek sanctuary in her church" would be sufficient to allege that she intends to shield those persons from detection.[10]   For the foregoing reasons, Santiago has standing to challenge § 13-2929.

---

"the purpose of avoiding [the aliens'] detection by immigration authorities"). The Arizona state courts are not, however, bound by federal interpretations of federal law when interpreting their own state harboring provision.  Nor is the federal interpretation adopted in *You* entirely stable. In *United States v. Costello*, the federal government argued that "harboring" under 8 U.S.C. § 1324 should be defined broadly to include a defendant who has allowed her boyfriend, an unauthorized alien, to live with her.  666 F.3d 1040 (7th Cir. 2012).  The government argued that "harboring" simply meant "to house a person."  *Id*. at 1043.  While the Seventh Circuit ultimately determined that the statute should require more, it cited to several other cases that have defined harboring more broadly to include simple sheltering.  *Id.* at 1049–50 (citing *United States v. Acosta de Evans*, 531 F.2d 428, 430 (9th Cir. 1976) ("We believe that [the purpose of the statute] is best effectuated by construing 'harbor' to mean 'afford shelter to' and so hold."); *United States v. Kim*, 193 F.3d 567, 573–74 (2d Cir. 1999)).

Given the foregoing, there is a reasonable probability that Arizona law enforcement and courts will interpret both the federal and state statutes broadly and find that an individual violates § 13-2929 whenever she knowingly or recklessly affords shelter to or transports an unauthorized alien.

[10] Sanctuary is commonly defined as a "place of refuge or asylum." *Sanctuary*, The American Heritage Dictionary, http://www.ahdictionary.com/word/search.html?q=sanctuary (last visited Sept. 21, 2013).

### B. Organizational Standing

We also hold that the organizational plaintiffs have standing to challenge § 13-2929. An organization has "direct standing to sue [when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). An organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

Southside Presbyterian Church ("Southside"), Border Action Network ("BAN"), and Arizona South Asians for Safe Families ("ASASF") have established standing under this standard. The declaration provided by Southside's pastor establishes that (1) the church runs a homeless program and "Samaritans" program, both of which offer transportation and shelter to unauthorized aliens, and therefore reasonably fears that its volunteers will be deterred from participating in light of § 13-2929's prohibitions and (2) it will be required to divert resources to educate its members and counteract this frustration of its mission. Likewise, BAN's executive director's declaration establishes that, as part of its regular activities, its staff buses members, many of whom are unauthorized aliens, to various organizational functions. Therefore, BAN reasonably fears that its staff will be subject to investigation or prosecution under the statute and may be

deterred from conducting these functions, which would frustrate its organizational mission. Moreover, because of BAN's members' overwhelming concerns about the effects and requirements of S.B. 1070, BAN has been forced to divert staff and resources to educating their members about the law. Finally, ASASF's answers to defendant's interrogatories show that it too has had to divert resources to educational programs to address its members' and volunteers' concerns about the law's effect.

We conclude that the organizational plaintiffs have clearly shown that S.B. 1070, and § 13-2929 in particular, has "perceptibly impaired" their ability to carry out their missions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) ("[A]t the preliminary injunction stage, a plaintiff must make a 'clear showing' of his injury in fact."). Many of the organizational plaintiffs' core activities involve the transportation and/or provision of shelter to unauthorized aliens, and they have diverted their resources to address their constituents' concerns about the impact of § 13-2929. Despite Arizona's arguments that the organizational plaintiffs' statements of injury are too vague to sustain standing, we have found organizational standing on the basis of similar organizational affirmations of harm.[11] *See Fair*

---

[11] Arizona also argues that the organizations' 2010 declarations can no longer support a finding of standing because they are outdated. But as the Court explained in *Davis v. Fed. Election Comm'n*, "[w]hile the proof required to establish standing increases as the suit proceeds . . . the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." 445 U.S. 727, 734 (2008). Therefore, it is entirely appropriate for us to consider the 2010 declarations in determining whether the organizational plaintiffs had the requisite stake in the case when they filed

*Hous. Council of San Fernando Valley*, 666 F.3d at 1219 (finding standing at the preliminary injunction stage based on FHC's statements that it "investigated Roommate's alleged violations and, in response, started new education and outreach campaigns targeted at discriminatory roommate advertising"); *see also Smith v. Pac. Props & Dev. Corp.*, 348 F.3d 1097, 1105 (9th Cir. 2004) (finding standing where an organization alleged that "in order to monitor the violations and educate the public regarding the discrimination, [it] has had . . . to divert its scarce resources from other efforts . . . to benefit the disabled community in other ways"). Because the organizational plaintiffs have shown that their missions have been frustrated and their resources diverted as a result of § 13-2929, they have standing to challenge it.

---

their claim. Although Arizona is correct that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed," that inquiry goes to mootness rather than standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Services*, 528 U.S. 167, 190–92 (2000) (discussing the important distinction between standing and mootness). A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (internal quotation marks omitted); *see also San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1159 (9th Cir. 2002) ("To establish mootness, a defendant must show that the court cannot order any effective relief. Defendants claiming mootness must satisfy a heavy burden of persuasion." (internal citations and quotation marks omitted)). Arizona has not shown, or attempted to show, that this court could not order any effective relief. Therefore, its claims regarding plaintiffs' current stake in the case as opposed to their stake at the time of filing are misplaced.

## II.  VAGUENESS

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *United States v. Backlund*, 689 F.3d 986, 996 (9th Cir. 2012) (quoting *United States v. Kim*, 449 F.3d 933, 941 (9th Cir. 2006) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972))) (internal quotation marks omitted).  A statute is void for vagueness if it "fails to give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (quoting *Grayned*, 408 U.S. at 108); *see also United States v. Williams*, 553 U.S. 285, 304 (2008).  Where a statute imposes criminal sanctions, "a more demanding standard of scrutiny applies." *Id.* at 712 (internal quotation marks omitted); *see also United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) ("For statutes . . . involving criminal sanctions the requirement for clarity is enhanced." (internal quotation marks omitted) (alteration in original)).

Section 13-2929 states that "[i]t is unlawful for a person who is *in violation of a criminal offense*" to knowingly or recklessly transport, conceal, harbor, or shield an unauthorized alien.  We conclude that the phrase "in violation of a criminal offense" is unintelligible and therefore the statute is void for vagueness.[12]

---

[12] The plaintiffs did not originally raise this issue.  But in order to address the plaintiffs' preemption claim, we must first interpret the statute's provisions.  In attempting to do so, we are confronted with this incomprehensible element of § 13-2929.  Thus, we resolve the vagueness issue because it is both "antecedent to . . . and ultimately dispositive of" the appeal before us. *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990); *see also U.S. Nat'l Bank of Oregon v. Ind. Ins. Agents of Am., Inc.*,

An "offense" is defined by the Arizona criminal code as:

> [C]onduct for which a sentence to a term of imprisonment or of a fine is provided by any law of the state in which it occurred or by any law, regulation or ordinance of a political subdivision of that state and, if the act occurred in a state other than this state, it would be so punishable under the laws, regulations or ordinances of this state or of a political subdivision of this state if the act had occurred in this state.

Ariz. Rev. Stat. § 13-105. This accords with the common usage of the word "offense" to mean "a breach of a law or rule; an illegal act." *Offense*, Oxford U.S. English Dictionary, http://oxforddictionaries.com/definition/ american_english /offense (last visited Sept. 16, 2013). Black's Law Dictionary defines both "offense" and "criminal offense" as "a violation of the law." *Offense*, Black's Law Dictionary (9th ed. 2009). In sum, an offense is an action (or, sometimes, inaction).[13] And one cannot violate, or be in violation of, an action. One can only violate an object, such as a law or an agreement. *See Violate*, Oxford U.S. English

---

508 U.S. 439, 447 (1993) (stating that a court can rule on an antecedent issue even if "the parties fail to identify and brief [it]").

[13] Although the Arizona criminal code does not define "criminal offense" generally, the code does define "criminal offense" for purposes of the crime victims' rights chapter of the code. Ariz. Rev. Stat. tit. 13, ch. 40. The definition—"conduct that gives a peace officer or prosecutor probable cause to believe that a felony, a misdemeanor, a petty offense or a violation of a criminal ordinance has occurred"—is also framed in terms of conduct. Ariz. Rev. Stat. § 13-4401.

Dictionary, http://oxforddictionaries.com/definition/ american_english/violate (defining four different meanings of the verb "violate," depending on the type of object—either a "rule or formal agreement," "someone's peace, privacy, or rights," "something sacred," or "someone").

"In violation of an offense," an element of § 13-2929, thus translates to "in violation of a violation of the law," which is, of course, nonsensical. While "[s]tatutes need not be written with 'mathematical' precision," "they must be intelligible." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000), *amended* 247 F.3d 903 (9th Cir. 2000) and *amended* 260 F.3d 1159 (9th Cir. 2001). The "violation of an offense" element of § 13-2929, which has no discernible meaning, simply cannot meet this test.

"Outside the First Amendment context, a plaintiff alleging facial vagueness must show that the enactment is impermissibly vague in all its applications." *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (internal quotation marks omitted). Therefore, a statute is only facially void for vagueness if it "is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Alphonsus v. Holder*, 705 F.3d 1031, 1042 (9th Cir. 2013) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982)). "Such a provision simply has *no* core." *Vill. of Hoffman Estates*, 455 U.S. at 495 n.7 (emphasis in original); *see e.g.*, *Forbes*, 236 F.3d at 1012 (concluding that the undefined terms "experimentation," "investigation," and "routine" in the statute were so ambiguous that the statute did not "establish any 'core' of unquestionably prohibited activities"). Section

13-2929 is exactly the type of statute that has "*no* core." *Id.*
The element of being "in violation of a criminal offense" is
not simply an "imprecise but comprehensible normative
standard" but rather an incomprehensible element that
provides "no standard of conduct . . . at all." *Id.* Therefore,
we hold that the statute is unconstitutionally vague. On this
basis, we affirm the district court's injunction. *Enyart v.
Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153,
1159 (9th Cir. 2011) ("We may affirm the district court on
any ground supported by the record.").

Arizona makes no claim that "in violation of a criminal
offense" makes any sense as written. Nonetheless, Arizona
argues that we should substitute the phrase "in violation of a
law or statute" for "in violation of a criminal offense"
because this is the "common understanding" of the latter
phrase. But there is no common understanding of the strange
phrase "in violation of an offense."[14] There is only a common

---

[14] Arizona attempts to establish this "common understanding" by
referring to a few cases across the circuits that it argues use the phrase
"violation of an offense." But, as Arizona acknowledges, these cases
generally cross-reference a particular enumerated offense or set of
offenses. *See, e.g.*, *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733,
743 (10th Cir. 2007) ("If a person under arrest for violation of an offense
enumerated in the Motor Vehicle Code . . . ." (quoting N.M. Stat. Ann.
§ 66-8-111(A)). While the language in these off-handed cases is still
grammatically incorrect, the cross-references to specific statutorily created
offenses make clear the courts' meaning in each of these cases. The
statute here provides no similar cross-reference. It does not, for example,
say "in violation of a criminal offense enumerated in the Arizona criminal
code."

Even if these cases were not distinguishable on this ground, we doubt
that the use of this incomprehensible phrase by a few courts across the

understanding of the words "violation" and "offense," and those meanings applied to this phrase create a nonsensical result.

In the alternative, Arizona argues that we should interpret the statute as they suggest because it is a possible limiting construction that would save the statute. But the cases Arizona relies upon are inapposite. They are cases where the state provided a reasonable narrowing construction to statutory language amenable to several interpretations. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 617 (1973) ("The State Personnel Board, however, has construed [§] 818's explicit approval of 'private' political expression to include virtually any expression not within the context of active partisan political campaigning, and the State's Attorney General, in plain terms, has interpreted [§] 818 as prohibiting 'clearly partisan political activity' only."); *Law Students Research Council v. Wadmond*, 401 U.S. 154 (1971) (accepting the state authorities' limited construction of the terms "form of the government of the United States," "belief," and "loyalty" in approving a rule governing admission to the New York State bar).

Here, Arizona asks us not to adopt a narrowing construction, but rather to replace a nonsensical statutory element with a different element. Rewriting the statute is a job for the Arizona legislature, if it is so inclined, and not for this court. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249 (1989); *see also Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998) ("Although we must consider the City's limiting construction of the ordinance, we are not

years would be sufficient to give notice of this element's meaning to the "person of ordinary intelligence." *Hunt*, 638 F.3d at 712.

required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance."). The Arizona legislature knows how to write a statute requiring the commission of a predicate criminal offense and could have done so here. *See, e.g.*, Ariz. Rev. Stat. § 13-1508(A) ("A person commits burglary in the first degree if such person or an accomplice violates the provisions of either § 13-1506 or 13-1507 and knowingly possesses explosives, a deadly weapon or a dangerous instrument *in the course of committing any theft or any felony*.") (emphasis added); Ariz. Rev. Stat. § 13-2323(B) ("A person commits assisting a human smuggling organization by *committing any felony offense*, whether completed or preparatory, at the direction of or in association with any human smuggling organization.") (emphasis added).

"[A]ny narrowing construction of a state statute adopted by a federal court must be a reasonable and readily apparent gloss on the language." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004). Exchanging the words "a criminal offense" for the words "a law or statute" is not a "readily apparent gloss" on the statute's language.[15]     As   currently   drafted,   the   statute   is

---

[15] In considering Arizona's proposed revision to the statute, "we are especially mindful of our uncomfortable position as a federal court construing a state statute." *Planned Parenthood of Idaho, Inc.*, 376 F.3d at 932. "When federal courts rely on a 'readily apparent' constitutional interpretation, plaintiffs receive sufficient protection from unconstitutional application of the statute, as it is quite likely nonparty prosecutors and state courts will apply the same interpretation. Where federal courts apply a strained statutory construction, however, the state courts and non-party prosecutors, not bound by a federal court's reading of a state statute, are free to, and likely to, reject the interpretation and convict violators of the statute's plain meaning. The result is inadequate relief from

incomprehensible to a person of ordinary intelligence and is therefore void for vagueness.

## III.  PREEMPTION

Even were we to accept Arizona's proposed interpretation of § 13-2929, we conclude that the statute is also preempted by federal law. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) ("Panels often confront cases raising multiple issues that could be dispositive, yet they find it appropriate to resolve several, in order to avoid repetition of errors on remand or provide guidance for future cases. Or, panels will occasionally find it appropriate to offer alternative rationales for the results they reach."). Our analysis is guided by the Supreme Court's most recent discussion of preemption principles in *Arizona*, 132 S. Ct. at 2492, and the three out-of-circuit decisions finding nearly identical provisions in Alabama, Georgia, and South Carolina preempted by federal law. Therefore, we also affirm the district court's order on this additional ground.

### A.  Guiding Preemption Principles

The preemption doctrine stems from the Supremacy Clause. It is a "fundamental principle of the Constitution [] that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). There are "three classes of preemption": express preemption, field preemption and conflict preemption. *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). "The first,

unconstitutional prosecution for plaintiffs who do not or cannot sue every conceivable state prosecutor who could institute proceedings against them." *Id.*

express preemption, arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Id*.; *see also Arizona*, 132 S. Ct. at 2500–01. Under the second, field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. Field preemption can be "inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Third, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372. Conflict preemption, in turn, has two forms: impossibility and obstacle preemption. *Id*. Courts find impossibility preemption "where it is impossible for a private party to comply with both state and federal law." *Id.* Courts will find obstacle preemption where the challenged state law "stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Finally, any direct regulation of immigration—"which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"—is constitutionally proscribed because the "[p]ower to regulate immigration is unquestionably exclusive federal power." *DeCanas v. Bica*, 424 U.S. 351, 354–55 (1976).

Analysis of a preemption claim "must be guided by two cornerstones of [the Supreme Court's] jurisprudence. First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.' Second, '[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the states have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)) (internal quotation marks and citations omitted) (alterations in original). *But see United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n assumption of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." (internal quotation marks omitted)).

## B. § 13-2929 is Field Preempted

As discussed above, field preemption can be inferred either where there is a regulatory framework "so pervasive . . . that Congress left no room for the States to supplement it" or where the "federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 132 S. Ct. at 2501. As the Supreme Court reiterated in *Arizona*, the federal government has "broad, undoubted power over the subject of immigration and the status of aliens." *Id.* at 2498. This authority rests in part on the federal government's constitutional power to "establish an uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4, but also rests significantly on "its inherent power as a sovereign to control and conduct relations with foreign relations." *Id*. Federal control over immigration

policy is integral to the federal government's ability to manage foreign relations:

> Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad.
>
> It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.

*Id.* (citations omitted). In light of this federal interest, "[f]ederal governance of immigration and alien status is extensive and complex." *Id.* at 2499. It is within this context that § 13-2929 must be analyzed.

In *Arizona*, the Court held that section 3 of S.B. 1070 was field preempted. It held that the federal plan for alien registration—which includes requirements for registration, fingerprints, change of address reporting, and carrying proof of registration and provides penalties for failure to register—was a "single integrated and all-embracing system," designed as a "harmonious whole," with "a full set of standards . . . including the punishment for noncompliance." 132 S. Ct. at 2501–02. Thus, it concluded that the federal government "occupie[s] the field of alien registration" and

"even complementary state regulation is impermissible." *Id.* at 2502.

Section 13-2929 attempts to regulate conduct—the transportation and/or harboring of unauthorized aliens—that the federal scheme also addresses. Federal law, as set forth in 8 U.S.C. § 1324 prohibits a nearly identical set of activities as § 13-2929. Section 1324 provides, in relevant part:

> Any person who—
>
> . . .
>
> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
>
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;
>
> (iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact

that such coming to, entry, or residence is or
will be in violation of law; or

. . .

shall be punished as provided in subparagraph
(B).

*Id.* § 1324 (a)(1)(A). The remainder of § 1324 outlines a
detailed set of graduated punishments for violations,
§ 1324(a)(1(B)(i)–(iv), (a)(2)(A)–(B), (a)(3)(A), (a)(4), (b),
prescribes special evidentiary rules, § 1324(b)(3), (d), and
mandates the creation of an educational program on the
penalties for harboring aliens, § 1324(3).

Section 1324 is also part of a larger federal scheme of
criminal sanctions for those who facilitate the unlawful entry,
residence, or movement of aliens within the United States.
*See* 8 U.S.C. § 1323 (penalizing transportation companies and
persons for bringing aliens to the United States without valid
passports and necessary visas or taking consideration
contingent upon an alien's admission to the United States);
§ 1327 (penalizing those who aid or assist certain
inadmissible aliens to enter the country); § 1328 (penalizing
those who import aliens for immoral purposes). Aliens
themselves may also be criminally prosecuted for unlawful
entry or reentry into the United States. *Id.* § 1325 (penalizing
improper entry); § 1326 (penalizing unauthorized reentry
following removal).

Thus, the scheme governing the crimes associated with
the movement of unauthorized aliens in the United States,
like the registration scheme addressed in *Arizona* (and *Hines*),
provides "a full set of standards" designed to work as a

"harmonious whole." 132 S. Ct. at 2501.**[16]** A version of § 1324 has been part of our "extensive and complex," *Arizona*, 132 S. Ct. at 2499, federal immigration scheme for over a century. *United States v. Sanchez-Vargas*, 878 F.2d 1163, 1168 (9th Cir. 1989). Its slow evolution over time demonstrates Congress's intentional calibration of the appropriate breadth of the law and severity of the punishment. *Id.* at 1168–70. As we explained in *Sanchez-Vargas*, the current version of § 1324 "now presents a single comprehensive 'definition' of the federal crime of alien

---

**[16]** Arizona argues that *Gonzales v. Peoria*, 722 F.2d 468 (9th Cir. 1983), already resolved the question of whether federal law on harboring unauthorized aliens is field preemptive. But Arizona is incorrect. *Gonzales* addressed a distinct question from the one raised here. It considered whether the criminal immigration statutes preempted local law enforcement arrests for violations of those federal statutes. Within that context, we wrote:

> [T]his case does not concern that broad scheme [of removal regulation], but only a narrow and distinct element of it—the regulation of criminal immigration activity by aliens. The statutes relating to that element are few in number and relatively simple in their terms. They are not, and could not be, supported by a complex administrative structure. It therefore cannot be inferred that the federal government has occupied the field of criminal immigration enforcement.

*Id.* at 475. The foregoing analysis makes perfect sense within the context of determining the authority of local law enforcement officers to *arrest* for violations of the federal criminal immigration statutes. The federal criminal immigration statutes rarely address the question of arrests and the section that does explicitly allows for local law enforcement arrests. Thus, the federal government did not occupy the field with respect to arrests for violations of these statutes. *Gonzales* says nothing about whether the statutory scheme is comprehensive with respect to the substantive prohibitions of the federal criminal immigration statutes.

smuggling—one which tracks smuggling and related activities from their earliest manifestations (inducing illegal entry and bringing in aliens) to continued operation and presence within the United States (transporting and harboring or concealing aliens)." *Id.* at 1169.

Moreover, in developing the scheme for prohibiting and penalizing the harboring of aliens, Congress specifically considered the appropriate level of involvement for the states. Section 1324(c) allows state and local law enforcement officials to make arrests for violations of § 1324. Congress did not, however, grant states the authority to prosecute § 1324 violations, but instead vested that power exclusively in the federal authorities. *See* 8 U.S.C. § 1329; 18 U.S.C. § 3231; *see also GLAHR*, 691 F.3d at 1258, 1264. Thus, "the inference from these enactments is that the role of the states is limited to arrest for violations of federal law." *GLAHR*, 691 F.3d at 1264.

The Third, Fourth, and Eleventh Circuits, in cases addressing similar statutes,[17] all recently concluded that the

---

[17] The Georgia law in *GLAHR* was virtually indistinguishable from the provision challenged in this appeal. *GLAHR*, 691 F.3d at 1263. The Alabama and South Carolina laws were very similar but arguably broader because they did not include the "violation of a criminal offense" element. *United States v. South Carolina*, 720 F.3d 518, 523 (4th Cir. 2013); *Alabama*, 691 F.3d at 1277. However, as discussed, this element is incomprehensible and, even under Arizona's interpretation, the element is illusory because a simultaneous violation of the federal harboring law could suffice.

The City of Hazleton's ordinance in the Third Circuit case made it "unlawful for any person or business or entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains

federal scheme on harboring is comprehensive and field preemptive. *Lozano*, 2013 WL 3855549 at \*14–15; *South Carolina*, 720 F.3d at 531–32; *Alabama*, 691 F.3d at 1288; *GLAHR*, 691 F.3d at 1267. Based on the foregoing—the comprehensive nature of § 1324, its place within the INA's larger structure governing the movement and harboring of aliens, and § 1324(c)'s explicit but limited provision for state involvement—the Eleventh Circuit concluded that the INA demonstrates an "overwhelmingly dominant federal interest in the field." *GLAHR*, 691 F.3d at 1264. Because Congress has dominated the field and "adopted a calibrated framework within the INA to address this issue," the Eleventh Circuit held that any "state's attempt to intrude into this area is prohibited." *Id.*; *see also Alabama*, 691 F.3d at 1286 ("Like the Georgia law at issue in *GLAHR*, we similarly conclude that Alabama is prohibited from enacting concurrent state legislation in this field of federal concern.").

The Fourth Circuit came to the same conclusion. *South Carolina*, 720 F.3d at 531 ("Sections 4(B) and (D) [South Carolina's challenged harboring and transportation provisions] of the Act are field preempted because the vast array of federal laws and regulations on this subject is 'so pervasive . . . that Congress left no room for the States to supplement it.'" (quoting *Arizona*, 132 S. Ct. at 2501)). Unsurprisingly, in addressing a law outlawing renting housing to unauthorized aliens, the Third Circuit concurred: "We agree with the Eleventh Circuit and other courts that have held that 'the federal government has clearly expressed

---

in the United States in violation of law." *Lozano*, 2013 WL 3855549 at \*12. "'Harboring' is broadly defined to include 'let[ting], leas[ing], or rent[ing] a dwelling unit to an illegal alien.'" *Id.* (quoting The Illegal Immigration Relief Act Ordinance § 5A(1)) (alterations in original).

more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelming dominant federal interest in the field.'" *Lozano*, 2013 WL 3855549 at *14 (quoting *GLAHR*, 691 F.3d at 1264).**[18]**  We also agree.

## C. Section 13-2929 is Conflict Preempted

A statute is conflict preempted where it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Hines*, 312 U.S. at 67).  We conclude that § 13-2929 is conflict preempted because, although it shares some similar goals with 8 U.S.C. § 1324, it "interfere[s] with the careful balance struck by Congress with respect to" the harboring of unauthorized aliens.  *Arizona*, 132 S. Ct. at 2505.  As *Arizona* reiterated, "a '[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.'"  *Id.* (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)); *see also American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427 (2003)

---

**[18]** *See also Garrett v. Escondido*, 465 F. Supp. 2d 1043, 1056 (S. D. Cal. 2006) (finding that a harboring provision that prohibited leasing or renting housing to unauthorized aliens raises "serious concerns in regards to field preemption" based on 8 U.S.C. § 1324).  *But see Keller v. City of Fremont*, 719 F.3d 932 (8th Cir. 2013) ("We find nothing in an anti-harboring prohibition contained in one sub-part of one subsection of 8 U.S.C. § 1324 that establishes a 'framework of regulation so pervasive . . . that Congress left no room for the States to supplement it,' or evinces 'a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" (quoting *Arizona*, 132 S. Ct. at 2501)).  In *Keller*, a divided panel upheld a housing ordinance similar to the one challenged in *Lozano*.  For the all the reasons discussed above, we, along with the Third, Fourth, and Eleventh Circuits, disagree with *Keller*'s analysis.

(finding conflict preemption where the state sought "to use an iron fist where the President ha[d] consistently chosen kid gloves"); *Crosby*, 530 U.S. at 379 n.14 ("Identity of ends does not end our analysis of preemption.").

First, the provision of additional and different state penalties under § 13-2929 for harboring unauthorized aliens disrupts "the congressional calibration of force." *Crosby*, 530 U.S. at 380. Like the additional and distinct penalties section 3 imposed in *Arizona*, "[t]his state framework of sanctions creates a conflict with the plan Congress put in place." 132 S. Ct. at 2503; s*ee also GLAHR*, 691 F.3d at 1267 ("The end result of section 7 is to layer additional penalties atop federal law in direct opposition to the Court's direction in *Crosby*.").

Second, § 13-2929 conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes. As discussed above, the current federal scheme reserves prosecutorial power, and thus discretion, over harboring violations to federal prosecutors. By allowing state prosecution of the same activities in state court, Arizona has conferred upon its prosecutors the ability to prosecute those who transport or harbor unauthorized aliens in a manner unaligned with federal immigration enforcement priorities. In other words, "the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 132 S. Ct. at 2503; *see also GLAHR*, 691 F.3d at 1265 ("The terms of section 7, however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to

establish."); *Alabama*, 691 F.3d at 1287 (same).  Section 13-2929 also gives state courts the power to interpret it, unconstrained by how federal courts have interpreted the scope of 8 U.S.C. § 1324.

As the Eleventh Circuit explained:

> [I]nterpretation of [state harboring] crimes by state courts and enforcement by state prosecutors unconstrained by federal law threaten the uniform application of the INA. . . . Given the federal primacy in the field of enforcing prohibitions on the transportation, harboring, and inducement of unlawfully present aliens, the prospect of fifty individual attempts to regulate immigration-related matters cautions against permitting states to intrude into this area of dominant federal concern.

*GLAHR*, 691 F.3d at 1266;[19] *see also Arizona*, 132 S. Ct. at 2501 ("If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, 'diminish[ing] the [Federal Government]'s control over enforcement' and 'detract[ing] from the integrated scheme of regulation created by Congress.'" (quoting *Wisconsin Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288–89 (1986))); *see also Villas at Parkside Partners v. City of Farmers Branch*, No. 10-10751, 2013 WL 3791664 at *5 (5th Cir. July 22, 2013) (concluding that an ordinance criminalizing renting housing to unauthorized

---

[19] Arizona contends that the Eleventh Circuit erred in concluding that the federal courts have exclusive jurisdiction to "interpret the boundaries of federal law." *GLAHR*, 691 F.3d at 1265. Arizona seemingly argues that its state courts have concurrent jurisdiction over prosecutions under 8 U.S.C. § 1324. But that proposition is clearly foreclosed by 18 U.S.C. § 3231, which grants federal district courts exclusive jurisdiction over federal crimes.

Although Arizona failed to so argue in its brief, the better argument is presented by amicus. State courts do have concurrent jurisdiction over civil RICO claims, which can include violations of 8 U.S.C. § 1324. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) ("[S]tate courts have concurrent jurisdiction over civil RICO claims."); 18 U.S.C. § 1961(1)(F) (including violations of § 1324 in the definition of "racketeering activity"). But even this argument misses the mark. By passing a state statute criminalizing harboring, Arizona has vested its courts with the power to define the breadth and scope of its own prohibition on harboring unauthorized aliens, an area of important federal concern, unconstrained by federal priorities. Thus, although the text of the state and federal statutes is similar, Arizona's scheme may significantly differ in practice from the federal scheme and thus disrupt the uniformity of the federal scheme. A state court has concurrent jurisdiction over a civil RICO claim concerning a violation of 8 U.S.C. § 1324. But the federal courts remain the ultimate arbiters of the meaning of § 1324. The federal courts are not the ultimate arbiters of the meaning of Arizona's harboring statute. Therein lies the difference.

aliens is conflict preempted because it "giv[es] state officials authority to act as immigration officers outside the 'limited circumstances specified' by federal law" and "'interfer[es] with the careful balance struck by Congress' with respect to the harboring of non-citizens here contrary to law" (quoting *Arizona*, 132 S. Ct. at 2505–06)).[20]  In sum, § 13-2929, as interpreted by Arizona, "create[s] an obstacle to the smooth functioning of federal immigration law, improperly place[s] in the hands of state officials the nation's immigration policy, and strip[s] federal officials of the authority and discretion necessary in managing foreign affairs." *South Carolina*, 720 F.3d at 531.

The Arizona statute also conflicts with the federal scheme by criminalizing conduct not covered by the federal harboring provision.  First, Congress explicitly provided a safe harbor in § 1324 for certain religious activities.  8 U.S.C. § 1324(a)(1)(C).  The Arizona law provides no such safe harbor.  Therefore, individuals could be prosecuted for conduct that Congress specifically sought to protect through the exemption.  By seeking to punish conduct that Congress chose not to punish, the Arizona statute clearly poses an

---

[20] Indeed, the likelihood of differing enforcement priorities is far from speculative.  Under a current executive order, Arizona's state policy is to consider young people without official permanent legal status, but who have been granted deferred action status by the federal government under the Deferred Action for Childhood Arrivals initiative, to be "unlawfully present aliens." Executive Order 2012-06, "Re-Affirming Intent of Arizona Law in Response to the Federal Government's Deferred Action Program," (Aug. 15, 2012), *available at* http://azgovernor.gov/dms/upload/EO_081512_2012-06.pdf.  If the state applies this policy to its enforcement of § 13-2929, it would authorize the prosecution of those who transport or provide shelter to these young people despite the fact that the federal government has chosen to allow them to stay, and work, in the country.

obstacle to the accomplishment of the "full purposes and objectives of Congress," *Arizona*, 132 S. Ct. at 2501, one of which was to protect certain religious activities from prosecution.

Second, § 13-2929(A)(3) criminalizes encouraging or inducing an alien to come to or reside in Arizona. Section 1324 criminalizes encouraging or inducing an alien to come to or reside in the United States but it does not penalize encouraging or inducing aliens, already in the United States, to travel from state to state or into any particular state. Therefore, § 13-2929 sweeps more broadly than its federal counterpart by adding a new category of prohibited activities. In doing so, it disrupts the uniformity of the federal scheme because some harboring activities involving unauthorized aliens are now punishable in Arizona but not elsewhere. Thus, in addition to disrupting the uniformity of enforcement by federal authorities, § 13-2929 disrupts the substantive uniformity of the harboring scheme. It does not "closely track[ § 1324] in all material respects." *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1981 (2011).

For the foregoing reasons, even were we to adopt Arizona's interpretation of § 13-2929, it is conflict preempted by federal law.

## IV . Non-Merits Factors

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

For the reasons discussed in section II and III, we conclude that the plaintiffs are likely to succeed on the merits. The district court did not abuse its discretion in its analysis of the other non-merits factors. As discussed in section I, Santiago has demonstrated a credible threat of prosecution under the statute and the organizational plaintiffs have shown ongoing harms to their organizational missions as a result of the statute. Thus, the plaintiffs have established a likelihood of irreparable harm. *See GLAHR*, 691 F.3d at 1269 (finding a likelihood of irreparable harm because plaintiffs were "under the threat of state prosecution for crimes that conflict with federal law"); *see also Arizona*, 641 F.3d at 366 ("We have 'stated that an alleged constitutional infringement will often alone constitute irreparable harm.'" (quoting *Assoc. Gen. Contractors v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991))).

"'[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Arizona*, 641 F.3d at 366 (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009) *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. Of S. Cal., Inc.*, 123 S. Ct. 1204 (2012) ). Therefore, the district court did not abuse its discretion in holding that plaintiffs established the elements necessary to grant a preliminary injunction.

## CONCLUSION

We hold that the individual plaintiff and organizational plaintiffs have standing to challenge Ariz. Rev. Stat. § 13-2929. We further hold that § 13-2929 is void for vagueness

and, in the alternative, preempted by federal law. The district court's partial grant of plaintiffs' motion for a preliminary injunction is **AFFIRMED**.

---

BEA, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority opinion's holdings regarding standing and the void for vagueness doctrine, as well as its holding that "the district court did not abuse its discretion in holding that plaintiffs established the elements necessary to grant a preliminary injunction." Op. at 44. I write separately to address Part III of the majority's opinion, from which I respectfully dissent. Because this case is resolved on other grounds, namely vagueness, I believe the court should not reach the preemption issue. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 953 (9th Cir. 2009) *aff'd sub nom. Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729 (2011) ("Because we affirm the district court on these grounds, we do not reach two of Plaintiffs' [other] challenges to the Act . . . .").[1] And the "cardinal principle of

---

[1] The Plaintiffs in *Video Software Dealers* filed suit seeking to invalidate a California statute, "which imposed restrictions and a labeling requirement on the sale or rental of 'violent video games' to minors, on the grounds that the Act violate[d] rights guaranteed by the First and Fourteenth Amendments." *Video Software Dealers*, 556 F.3d at 953. The district court granted Plaintiffs' motion for summary judgment, invalidating the Act based on the Free Speech Clause and declining to address Plaintiffs' vagueness and Equal Protection arguments. *Id.* at 956. On appeal, the Ninth Circuit affirmed the district court's grant of summary judgment to the Plaintiffs based on their Free Speech claim. *Id.* at 953. Because the court resolved the case based on the Free Speech Clause, it declined to address the Plaintiffs' additional constitutional claims. *Id.*

judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment), *cited in Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part).