

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-23-00034-CR |
| Appellant, | § | Appeal from the |
| v. | § | 327th Judicial District Court |
| ISAIAS BURCIAGA, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20220d03763) |

## CONCURRING OPINION

I join Justice Palafox's majority opinion and write separately only to address arguments advanced by the dissent and to distance myself from one case (and its progeny) cited in the majority opinion. It would be bad enough for a court to tell a sovereign state that it cannot protect its citizens from a dangerous crime. It is doubly so when done only by reading the tea leaves of Congressional intent to find field preemption. The 11th Circuit did just that in *Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012) (*GLAHR*). Other courts have followed. Texas should not.

## I. THE AS-APPLIED FACTS

If we were forced to assume that the factual record at the hearing below contains all that is necessary for the as-applied preemption challenge, these are the relevant facts:

On the morning of August 9, 2022, a task force of Department of Public Safety officers watched two major east-west arteries in the upper valley of El Paso that were known conduits for drug and human smuggling (Artcraft and Country Club roads). Both roads connect Texas to a border area in New Mexico often used for smuggling persons and drugs into the United States.

U.S. Border patrol officers alerted the task force that persons were seen entering a white Impala that was spotted heading East (into Texas and the City of El Paso). At the time, Officer Martin Sanchez from the El Paso Police Department was patrolling in marked unit. He was asked by the Texas DPS to stop of the Impala because it was speeding. He located the Impala and confirmed for himself that the vehicle was traveling 46mph in a 30mph zone (in a part of Country Club that bisects a residential neighborhood). The Impala had darkened windows. After pulling the Impala over, its driver, Burciaga, appeared nervous as he interacted with Officer Martin.

Burciaga had three passengers in the vehicle. U.S. Border Patrol agents, who soon arrived at the scene, confirmed that Burciaga's three passengers were in the country illegally. Border Patrol took them into custody. Burciaga, after being read his *Miranda* rights, admitted to DPS officers that he knowingly picked up the three persons and was taking them to a motel. He was to receive an undisclosed amount of money later that day for doing so. He knew his passengers had entered the country illegally and he was transporting them to avoid detection of law enforcement. Burciaga himself has a Texas Drivers License and a federal Social Security number.

Gabriel Nava, a Captain with the DPS who supervises officers from El Paso to the Big Bend region, testified that criminal cartels from Mexico are behind the human smuggling in this area. Human smuggling is now their number one source of revenue. He described another "disturbing trend" where "one criminal organization is responsible for the smuggling" persons over the border and then "another organization . . . take custody of those people and charge them

a separate fee for passage." Not all persons being transported are illegal immigrants, others include people in forced servitude, unaccompanied children, and those in prostitution rings. Captain Nava testified that "a lot" of these smugglers have now armed themselves, and they tend to be reckless drivers and "really don't have any regard for the safety of our motor public either." In his words, "So, it's a profit and it's in anything for a profit, and these people are not seen as people to the organizations. They are dollar signs, so they don't care[.]"[1]

Based on this record, the trial court concluded that Tex. Penal Code § 20.05(a)(1)(a) was *not* preempted by federal law, either on its face or as applied.

## II.  HOW WE MUST VIEW FEDERAL PREEMPTION

"Dual sovereignty is a defining feature of our Nation's constitutional blueprint." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002). The Federal Government and the several States each balance the other's powers. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."). Accordingly, federal preemption should therefore never be viewed lightly, as it vests control in one sovereign to the exclusion of the other. *See Schwartz v. Texas*, 344 U.S. 199, 202–03 (1952) ("The exercise of federal supremacy is not lightly to be presumed.").

---

[1] Other sources agree: **"Migrant smuggling on the U.S. southern border has evolved over the past 10 years from a scattered network of freelance "coyotes" into a multi-billion-dollar international business controlled by organized crime, including some of Mexico's most violent drug cartels." New York Times *Smuggling Migrants at the Border Now a Billion-Dollar Business* 7/25/2022 (Smuggling Migrants at the Border Now a Billion-Dollar Business-The New York Times (nytimes.com) (last visited March 29, 2024) (also recounting the story of an abandoned tractor-trailer found near San Antonio with most of the 64 smuggled people inside already dead).

"When acting within its enumerated powers, 'Congress's choices range from complete reliance on state policy to complete preemption of state law, with many iterations of 'cooperative federalism' between these extremes.'" *Tex. Mut. Ins. Co. v. PHI Air Med., LLC*, 610 S.W.3d 839, 846 (Tex. 2020), (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 761 (4th Cir. 2018)). Congress may completely preempt state law through an express statement of that intent on the face of its statutes. *See Horton v. Kansas City S. Ry. Co.*, 692 S.W. 3d 112, 120 (Tex. 2024). No one makes that claim here. Instead, here we deal with the murkier area of "field" preemption where we try to discern Congress's intent. The guideposts that we must follow for that inquiry sometimes get lost in the paragraph structure, so I set them out separately:

- "A party arguing for implied preemption has the burden on that issue." *Horton*, 692 S.W. at 132 (citing *Mo. Pac. R.R. v. Limmer*, 299 S.W.3d 78, 84 (Tex. 2009)).

- Courts should hesitate to infer field preemption unless "the nature of the regulated subject matter permits no other conclusion" or "Congress has unmistakably so ordained." *De Canas v. Bica*, 424 U.S. 351, 356 (1976).

- "[Implied preemption], like all preemption arguments, must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

- "The purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted).

- Implied preemption analysis does not justify a "free wheeling judicial inquiry into whether a state statute is in tension with federal objectives"; such an endeavor "would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111, (1992) (Kennedy, J., concurring in part and concurring in judgment).

- "[I]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (internal quotation marks and alterations omitted).

As preemption is a question of law reviewed de novo, *PHI Air Med*, 610 S.W3d at 846, we must determine whether Congress intended to fill the entire field of human smuggling where the persons smuggled happen to be immigrants.

## III. THE AS APPLIED PREEMPTION CHALLENGE IS ONE OF FIRST IMPRESSION IN TEXAS

An as-applied challenge to § 20.05(a)(1)(a) has not been resolved by any Texas court. The one Texas case that address the constitutionality of § 20.05(a)(1)(a) heard and rejected a facial challenge. *State v. Flores*, 679 S.W.3d 232, 243–44 (Tex. App.—San Antonio 2023, pet ref'd). No as applied challenge was made in that case. *Id*. And no Texas Court of Criminal Appeals or Texas Supreme Court case gives us direct guidance. We are of course bound to follow dictates from the United States Supreme Court on preemption. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (stating that lower Texas courts must follow only higher Texas courts and the United States Supreme Court in deciding the "appropriate federal rule of decision").

The most recent and relevant decision of the United States Supreme Court is *Arizona v. United States*, 567 U.S. 387 (2012), which analyzed field and conflict preemption for four sections of an Arizona statute. The closest analog in those four provisions is the Court's discussion of Section 3 of Arizona's S.B. 1070. That section punished a noncitizen's "willful failure to complete or carry an alien registration document." *Arizona*, 567 U.S.at 400. After cataloging the federal regulations in the "field of alien registration," the Court concluded that "[t]he framework enacted by Congress leads to the conclusion . . . that the Federal Government has occupied the field of alien registration." *Id*. at 401. The Court noted "[t]he federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance." *Id*. Given

the federal government's extensive regulation in the filed of immigrant identification, the Court conclude that Arizona could not enter that same field. *Id*. at 403.

While respecting that opinion, I find its analogous support for preemption of § 20.05 tenuous. First, the most obvious difference. Arizona's statute was directed at the immigrants while § 20.05(a)(1)(a) of the Texas Penal Code is directed at the smugglers. The Court's discussion in *Arizona* dealt with state regulations of the aliens themselves, not the third-party smugglers who transport them. The distinction is stark. By definition, a law that punishes smugglers does not regulate aliens at all.

Second, the Court in *Arizona* chose its language carefully, and limited its holding to the *field* of alien registration. *Fuentes-Espinoza v. People*, 408 P.3d 445, 455 (Col. 2017) (Eid, J., dissenting) ("The Supreme Court in *Arizona* carefully limited its field preemption analysis to the particular field of alien registration."). When analyzing field preemption, the relevant field should be defined narrowly. *De Canas*, 424 U.S. at 360 n.8, (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78–79 (1941) (Stone, J., dissenting)) ("Every Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution. To discover the boundaries we look to the federal statute itself, read in the light of its constitutional setting and its legislative history."). And here, we deal with a different field—criminal conduct that facilitates the transport of aliens who have illegally entered the United States.

A third distinction between the Arizona and Texas statutes is the scope of the federal government's involvement in the areas that each State was regulating. Arizona attempted to insert itself into the documents that immigrants must carry—an area Congress began regulating in 1940, even well before its comprehensive 1952 Immigration and Naturalization Act. *Id*. at 400 (citing

6

*Hines*, 312 U.S. at 70 (referring to the 1940 Act as a "comprehensive scheme a complete system for alien registration"). The current registration enactment is also comprehensive, with requirements for fingerprinting, application, reporting changes of address, and requirements to carry proof of registration. *Arizona*, 567 U.S. at 401. By contrast, the federal crime for transporting illegal aliens is found in a single section of Title 8, and the specific subsection criminalizing the transport of those persons consumes a mere 53 words. 8 U.S.C. § 1324(a)(ii).

Aside from *Arizona v. U.S.*, several federal circuit of appeals cases and one out-of-state decision have preempted of state smuggling statutes.[2] And while we might consider those opinions for their persuasive value, we need not follow them. *See Pidgeon v. Turner*, 538 S.W.3d 73, 83 (Tex. 2017) (holding that court of appeals erred in directing trial court to conduct proceeding consistent with a federal 5th Circuit precedent); *Penrod Drilling*, 868 S.W.2d at 296 ("While Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision, they are *obligated* to follow only higher Texas courts and the United States Supreme Court) (emphasis original); *Barstow v. State*, 742 S.W.2d 495, 500–01 (Tex. App.—Austin 1987, writ denied) (stating that decisions of the federal courts of appeal do not "bind *any* Texas court, *even on federal questions*, although they are of course received with respectful consideration[.]") (emphasis original).

For the reasons discussed next, I find those opinions unpersuasive.

---

[2] *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013);*Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012); *Fuentes-Espinoza v. People*, 408 P.3d 445, 446 (Colo. 2017).

## IV. FIELD PREEMPTION

Field preemption precludes States, "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. As our governing standards dictate, we must first define the "field" and determine whether "Congress has unmistakably so ordained" that Texas is excluded from that field. *De Canas*, 424 U.S. at 356. We answer those questions from "the text and structure of the statute at issue.'" *Kansas*, 589 U.S. at 208 (quoting, *CSX Transp., Inc.*, 507 U.S. at 664 ).

Immigration itself is an expansive field as Title 8 and the several federal agencies that administer it attest. In broad brush, it regulates who may enter the country, who may stay and for how long, and while here, it addresses issues like work and housing concerns. But the federal statute on which Burciaga urges preemption occupies a much narrower field—criminalization of those who in varying ways assist the circumvention of the legal immigration process, and particularly here, transporting of aliens who have who have no legal status here. Courts should also separate the central concern of a federal enactment, from its mere peripheral concern. In *DeCanas v. Bica*, the Court declined to preempt a California statute that regulated the hiring of illegal entrants. 424 U.S. 351, 360–61 (1976). Based on the federal enactments on that topic *at that time*, employment was only a "peripheral concern" of Congress. *Id*.[3] As the *DeCanas* Court observed, "[t]he central concern of the INA is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Id*. at 359. I find no indication that usurping state police powers to control smuggling fits into that central concern.

---

[3] Congress later legislated more extensively in that field. *See* 8 U.S.C. 1324a.

Congress criminalizes the conduct of those who assist in illegal immigration in 8 U.S.C. § 1324. Paraphrasing § 1324(a), it identifies four types of illegal conduct: (1) bringing aliens into the country at other than a port of entry; (2) knowing or reckless transport of aliens not lawfully here "in furtherance of such violation of law"; (3) harboring or shielding those aliens from detection; and (4) encouraging or inducing aliens to enter or reside here in violation of the law. 8 U.S.C. § 1324(a)(1)(A)(i)(ii)(iii) (iv). Other provisions in §1324 provide a defense for bona fide religious denominations and purposes; allow for seizure of vessels, vehicles, or aircraft used in the violation of the section; set a standard for how to prove an alien is here in violation of the law; allow for use of videotaped depositions; and provide for the punishment ranges. 8 U.S.C. 1324(a)(1)(B) (penalty provision), (C) (religious exemption); (a)(3) (penalty for employing), (a)(4) (penalty enhancement); (b) (seizure of vessels); (b)(3) (evidence standard); (c) (authority to arrest); (d) (videotaped witness testimony).

Yet of those provision, only § 1324(c) refers to State actors. It provided that "[n]o officer or person shall have authority to make any arrests for violation of any provision of this section except officers and employees of the Service designated by the Attorney General . . . and all other officers whose duty it is to enforce criminal laws." 8 U.S.C. § 1324(c). By its wording, the provision "allows state and local law enforcement officials to make arrests for violations of § 1324." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1025 (9th Cir. 2013); *Arizona*, 567 U.S. 387, 448, (Scalia, dissenting) (including parenthetical stating that § 1324(c) provides state officials "authority to make arrests for transporting and harboring certain aliens."). Because this kind of conduct might occur anywhere throughout the United States, it unsurprising that Congress wanted to enlist state and local assistance in making arrests. But using that provision to say a State cannot also criminalize some overlapping conduct within its own borders is an overstatement.

9

The textual support for field preemption is mostly attributed to 8 U.S.C. § 1329. *See GLAHR*, 691 F.3d at 1265 (citing § 1329 for proposition that "[b]y confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney"). While that statement is literally true—state prosecutors do not file cases in federal court, nor do they indict defendants on federal charges in state court— this begs the question of whether Texas may enact a state crime to prosecute those in this state that engage in the same criminal conduct. I disagree that any of the authority cited by the federal circuits address *that* proposition.

And a dissection of §1329 shows the opposite. The section contains five sentences. Only three of those sentences touch on the question here, and I set them out below with a commentary on each:

> *"The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this subchapter."*

Nothing surprising here. Congress dictates the jurisdiction of federal courts, whose limited jurisdiction arises only from "that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013). What *is* relevant can be found in the text of the prior version of this sentence: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this title."[4] The 1997 revision inserted the phrase "brought by the United States" which operates as a term of limitation, and seems if anything, to acknowledge that other jurisdictions might have their own interest in pursuing parallel crimes.[5]

---

[4] *See* Immigration and Nationality Act, Pub. L. No. 414, 1952 U.S.C.C.A.N. 228, amended by the Omnibus Consolidated Appropriations Act, PL 104–208, § 381, 110 Stat 3009–650.

[5] Omnibus Consolidated Appropriations Act, PL 104–208, § 381, 110 Stat 3009–650.

Or for that matter, § 1329 could have been drafted to read as does the first section of the general jurisdictional statute for federal crimes: "The district courts of the United States shall have original jurisdiction, *exclusive of the courts of the States*, of all offenses against the laws of the United States." 18 U.S.C.A. § 3231 (emphasis added). That wording might better support the exclusive jurisdiction argument—but the language used by Congress in § 1329 does not.

> *"It shall be the duty of the United States attorney of the proper district to prosecute every such suit when brought by the United States."*

The key phrase in this sentence is "every such suit" that refers to charges arising under provisions of this subchapter. Congress could have said, "every crime encompassing the conduct as described in this subchapter" which might then give § 1329 a meaning consistent with field preemption. Instead, Congress is simply telling Justice Department attorneys that they have a duty to prosecute § 1324(a) crimes.

> *"No suit or proceeding for a violation of any of the provisions of this subchapter shall be settled, compromised, or discontinued without the consent of the court in which it is pending and any such settlement, compromise, or discontinuance shall be entered of record with the reasons therefor."*

This might be the most telling sentence in § 1329. It limits a prosecutor's discretion to simply dismiss at their discretion the conduct that § 1324 describes. Rather than some indication that Congress wants to give the executive the discretion not to prosecute smugglers, it constrains a prosecutor's latitude to short shrift these crimes—the prosecutor must state on the record what they are doing and why—hardly a carte blanch to ignore this kind of conduct.[6]

---

[6] The other two sentences of §1329 are not relevant here: "Notwithstanding any other law, such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with a violation under section 1325 or 1326 of this title may be apprehended. . . . Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers." 8 U.S.C.A. § 1329

To be sure, three federal circuit courts of appeals have found field (and conflict preemption) of state laws that criminalized transporting illegal aliens. I simply find their analysis unpersuasive. The lead case is the 11th Circuit opinion in *GLAHR*. Its rationale includes language from *Arizona v. United States*, the arrest provision in § 1324(c), and court jurisdiction provision in § 1329 which I address above. 691 F.3d at 1263–65. *GLAHR* also hinges on the claim that § 1324 is a "comprehensive framework to penalize the transportation . . . of unlawfully present aliens." *Id*. at 1263. It finds that comprehensive scheme, however, in some odd places. *GLAHR* cites to § 1324(d) that authorizes videotaped depositions in the prosecution of the federal crime and § 1324(e) that mandates community outreach programs to "educate[] the public in the United States and abroad about the penalties for bringing in and harboring alien in violations of this section." *Id*. at 164 (quoting § 1324(e)). Allowing for video depositions is at best a procedural tool available to federal prosecutors. And setting aside that the community outreach provision makes no mention of transporting aliens, a program for PSA announcements hardly signals that Congress intends to fill a field to exclusion of all others.[7]

Moreover, that Congress may have been complete when writing its statute does not necessarily mean that it intended to fill a field. For instance, Congress wrote comprehensive rules on work requirements for public assistance that did not preempt state measures on the same topic. *New York State Dep't of Soc. Services v. Dublino*, 413 U.S. 405, 415 (1973). "The subjects of modern social and regulatory legislation often by their very nature require intricate and complex

---

[7] The 11th Circuit also looked to *Com. of Pa. v. Nelson*, 350 U.S. 497 (1956) which held that Pennsylvania could not criminalize sedition because Congress had comprehensively done so in the Smith Act. Yet the *Nelson* Court states at the outset that it does not "limit the right of the State to protect itself at any time against sabotage or attempted violence of all kinds." *Id*. at 500. Texas has done nothing more in protecting itself from the criminal organizations that transport persons in a way that raises risks to the ordinary Texas motorist.

responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem[.]" *Id*. Sometimes, "a detailed statutory scheme [is] both likely and appropriate, completely apart from any questions of pre-emptive intent." *Id*. So even calling the inclusion of provisions for videotaped depositions and PSA comprehensive, does not prove Congressional intent to preclude State actors in this field.

The other federal cases, *Whiting*, 732 F.3d 1006 and *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013), do little more than repeat most of the same arguments advanced in *GLAHR* and follow its holding as persuasive authority. *South Carolina*, 720 F.3d at 53; *Whiting*, 732 F.3d at 1026.[8] And even if those cases correctly decided the challenges to other state's laws, their application fails here. Section 20.05(a)(1)(a) does not require as an element of the offense that the person being smuggled is an illegal alien. Its core elements, with some additions and deletions over time, are only that a person "knowingly" uses a specified means of conveyance— motor vehicle—to transport another individual with the intent to conceal that individual from law enforcement. This has been the case since 1999 when the provision was first enacted.[9]

So while sharing some commonalities, the conduct criminalized in the Texas and federal statutes on transportation focus on different activities. Section 1324(a)(ii) makes it a crime to knowingly or recklessly transport of aliens not lawfully here "in furtherance of such violation of

---

[8] In the first section of the merits portion of the opinion in *Whiting*, the court struck down the Arizona statute because its language was "unintelligible" and was therefore "void for vagueness." 732 F.3d at 1019. The majority then went on, however, to address preemption. *Id.* at 1022. A dissenting justice argued the majority should have never reached the preemption claim given its vagueness holding. *Id.* at 1029 (Bea, J., concurring and dissenting).

[9] Act of May 24, 1999, 76th Leg., R.S., ch.1014 § 2, 4 Tex. Gen. Laws 3798, 3799 (including additional element of "substantial likelihood that the individual will suffer serious bodily injury"); Act of May 23, 2011, 82nd Leg., R.S. ch. 223, § 2, 1 Tex. Gen. Laws 799 (making serious bodily injury an enhancement from the base offense); Act of May 26, 2015 84th Leg., R.S. ch. 333 § 14, 2 Tex. Gen. Laws 1508, 1514 (adding "with intent to obtain a pecuniary benefit" as element of base offense).

law[.]" 8 U.S.C. § 1324(a)(1)(A)(ii). That is, the crime targets conduct that helps the alien in furtherance of his or her illegal activity. *See Fuentes Espinoza*, 408 P.2d at 456–57 (Eid, J., dissenting) (noting how the focus of the federal law is on the unlawful conduct of the passengers and that the driver is helping them accomplish it). The Texas statute focuses only on the conduct of the smuggler, no matter how it may help the person being smuggled. The difference in focus and conduct if anything justifies the common situation where dual sovereigns prosecute similar conduct, but for different crimes.[10]

\* \* \* \* \* \*

One more comment. The dissent does not reach the issue of conflict preemption, but alludes to some of the reasoning from courts that do. They claim that allowing States to criminalizing smuggling of undocumented immigrants within a state's borders will somehow interfere with important federal policies. The *GLAHR* court suggested that U.S. Attorneys must be able to exercise their discretion "in a manner consistent with the established enforcement priorities of the Administration they serve." 691 F.3d at 1265. (Which begs the question, what is a sovereign state supposed to do if federal "priorities" don't happen to include human smuggling within their borders?). The Fourth Circuit took this argument one step further, suggesting that State interdiction of domestic smugglers infringes on the Federal Government's role to conduct foreign policy. *South Carolina*, 720 F.3d at 531. That is, it is somehow necessary to our foreign relations *not* to prosecute

---

[10] As Justice Alito recently wrote for the majority of the Court:

> We have long held that a crime under one sovereign's laws is not "the same offence" as a crime under the laws of another sovereign. Under this "dual-sovereignty" doctrine, a State may prosecute a defendant under state law even if the Federal Government has prosecuted him for the same conduct under a federal statute.

*Gamble v. United States*, 587 U.S. 678, 681 (2019) (rejecting double jeopardy challenge to federal prosecution following a state law conviction for "felon in possession" of a handgun.).

Texans who for money, transport illegal immigrants to keep them secreted from immigration officers.

These arguments simply make no sense here. The State claims that Burciaga (for pay) transported persons with the intent to conceal them from law enforcement. I eagerly acknowledge that Burciaga's guilt is yet to be proven to a jury, and that there is no evidence in this record that he himself is involved in organized crime. But we would be sticking our heads in the sand to ignore that if not Burciaga, many like him, are directly or indirectly doing the cartel's bidding by moving human cargo through Texas.[11] What possible federal policy or foreign policy is fostered by not pursuing the prosecution every person who engages in this conduct? Section 20.05(a)(1)(a) is the quintessential exercise of a State's police powers to protect its own citizens. *See Flores*, 679 S.W.3d at 232 ("Here, Texas exercised its police powers to pass a criminal law that applies equally to those who smuggle citizens and those who smuggle noncitizens."); *Fuentes-Cruz v. Gonzales*, 489 F.3d 724, 726 (5th Cir. 2007) (finding violation of § 20.05 constitutes a crime or moral turpitude because of its fraudulent intent). If the State can prove its indictment, the conduct at stake should never be tolerated. Texas has every right to forbid it.

---

[11] Our record contains uncontradicted testimony that the Mexican cartels control the illegal migration business. And recent testimony before Congress would make the same point. In depositions taken for the House Committee on Homeland Security, the Chief Patrol Agent for the Tucson Sector, John Modlin, testified*:*

> Q: And turning briefly to human smugglings, you said earlier that cartels are responsible for the majority of human smuggling that you see in your sector. Is that correct?
>
> A: So—yeah. So if someone's being smuggled, they're using a criminal organization. So what's interesting about the border certainly that has changed significantly, when I started—you know, when I started in '95, people could just get to the border and cross on their own. You know, now nobody crosses without paying the cartels. So the cartels, you know, determine when people cross, you know, how many people cross at a time, all of that. It's all—it's all controlled by them.

https://homeland.house.gov/2023/12/14/now-nobody-crosses-without-paying-senior-border-patrol-agents-describe-unprecedented-cartel-control-at-southwest-border/ (last visited April 2, 2024).

JEFF ALLEY, Chief Justice

August 23, 2024

Before Alley, C.J., Palafox, and Soto, JJ.
Alley, C.J., concurring
Soto, J., dissenting

(Do Not Publish)